# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

| | | |
|---|---|---|
| STANLEY C. LUMPKINS, | ) | |
| | ) | |
| v. | ) | No. 1:06-0036 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security,[1] | ) | |

To: The Honorable Thomas A. Wiseman, Jr., Senior U. S. District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Secretary of Health and Human Services denying Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff has been under a disability beginning February 23, 2004, is not supported by substantial evidence in the record as required by 42 U.S.C. § 405(g).

---

[1]Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of the Social Security Administration. Fed. R. Civ. P. 25(d)(1).

1

## I. INTRODUCTION

The plaintiff filed an application for DIB dated September 26, 2001, alleging disability beginning on February 15, 2000.[2]  (Tr. 102-04.)  The plaintiff was found not disabled within the meaning of the Act on January 25, 2002. (Tr. 40-42, 56-60.) The plaintiff filed a request for reconsideration on March 29, 2002, citing his shoulder condition, his level of pain, and the difficulty of working six hours a day.[3]  (Tr. 61, 147-50.)  The plaintiff's claim was denied again upon reconsideration in a decision dated May 21, 2002.  (Tr. 43-44, 63-64.)  The plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ") on August 8, 2002.  (Tr. 65.)  A hearing was held on February 2, 2004.  (Tr. 312-53.)  The ALJ issued an unfavorable decision on June 25, 2004.  (Tr. 45-55.)  The plaintiff requested review of the ALJ's unfavorable decision on August 24, 2004.  (Tr. 77-89.)  The Appeals Council issued an order on September 29, 2004, vacating the decision dated June 25, 2004, and remanding the case for further consideration.  (Tr. 29, 91-94.)

---

[2]The plaintiff filed an earlier claim for benefits and had a previous hearing before an ALJ.  Although the earlier application and decision are not at issue here, they are relevant with respect to the plaintiff's date of onset in his current application, which cannot be any earlier than February 15, 2000, because the ALJ's previous decision denying benefits was issued on February 14, 2000.

[3]The reconsideration disability report is dated March 25, 2002, a few days before the plaintiff's April 8, 2002, request for reconsideration. (Tr. 150, 152.) This report erroneously lists the date of the original claim as September 26, 2002 (Tr. 147), a date that in March 2002, at the time the plaintiff completed the form, was still several months in the future.  The correct date is September 26, 2001, as indicated on the plaintiff's application.  (Tr. 102.)

Case 1:06-cv-00036   Document 21   Filed 03/28/08   Page 2 of 73 PageID #: 69

A supplemental hearing was held on January 26, 2005, in Nashville, Tennessee. (Tr. 354-88.) The plaintiff received notice of a partially favorable decision on July 25, 2005. (Tr. 16-18.) The ALJ concluded that the plaintiff was disabled, but fixed his date of onset at February 24, 2004, a date two months past the expiration of his insured status, December 31, 2003. (Tr. 25, 20.) The plaintiff filed a request for review of the hearing decision on September 21, 2005. (Tr. 10-15.) The ALJ's decision became the final decision of the Secretary when the Appeals Council denied the plaintiff's request for review on March 28, 2006. (Tr. 7-9.)

The plaintiff now requests judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). Before the Court is the plaintiff's motion for judgment on the administrative record or, in the alternative, for remand, and accompanying memorandum (Docket Entry Nos. 14 -15), to which the defendant has responded (Docket Entry No. 18).

## II. BACKGROUND

The plaintiff was born on February 4, 1959, and he was forty-one years old on February 15, 2000, the date of the alleged onset of disability. (Tr. 102.) The plaintiff attended school through the eleventh grade.[4] (Tr. 128.) The plaintiff worked as a sawmill

---

[4]Although the plaintiff does not so indicate on his Disability Report, other parts of the record indicate that the plaintiff received his GED, or completed high school. *See, e.g.,*

worker, industrial maintenance mechanic, truck driver, and farm hand worker. (Tr. 21, 361.) He suffered an on-the-job injury in 1998 while working as an industrial maintenance mechanic, and he was ultimately unable to return to work full time following that injury. (Tr. 359.) From 2000 through 2004, the plaintiff worked three or four days a month on a neighbor's farm doing light chores to earn money, about six dollars per hour. *Id.* The ALJ concluded that the plaintiff's work activity since 2000 did not constitute substantial gainful activity. (Tr. 21.)

### A. Chronological Background: Procedural Developments and Medical Records[5]

The plaintiff's current medical problems can be traced to his on-the-job injury on June 30, 1998. (Tr. 21.) Although his alleged date of onset in this case is fixed for administrative reasons at February 14, 2000, it is appropriate to review the plaintiff's records prior to this date where, as here, the plaintiff suffers from a chronic condition such as the one precipitated by the crushing injury to his right foot. *See supra* n.2.

On June 2, 1999, the plaintiff presented to Dr. Veena Anand, a family practitioner in Hohenwald, Tennessee, complaining of shoulder pain and reporting that Flexeril was

Tr. 357 (plaintiff's testimony at his administrative hearing that he completed high school).

[5]Every attempt to decipher the medical evidence of record was undertaken; however, several handwritten sections were simply illegible. General information on the drugs prescribed to the plaintiff was obtained from Drugs.com and similar reputable online resources, unless otherwise indicated.

Case 1:06-cv-00036   Document 21   Filed 03/28/08   Page 4 of 73 PageID #: 71

not helping with his pain.  (Tr. 190.)  He also reported that his right foot had been crushed in June 1998.  *Id.*

On July 28, 1999, Dr. Anand ordered an MRI on the plaintiff's right upper arm and shoulder due to shoulder pain.  (Tr. 199.)  The results of the MRI indicated a nearly complete tear of the rotator cuff tendon and osteophytes, or bone spurs, at the acromioclavicular (AC) joint, along with disruption of the anterior glenoid labrum, part of the shoulder joint.  *Id.*

The plaintiff had reconstructive right shoulder surgery at Centennial Medical Center on August 23, 1999.  (Tr. 190, 200.)  Dr. Jeffrey Lawrence repaired a torn right rotator cuff with bone spurs and ligament and tendon damage.  (Tr. 200.)

On October 4, 1999, the plaintiff presented to Dr. Jeffrey Adams, a specialist in orthopedic surgery at the Middle Tennessee Bone and Joint Clinic, complaining of right foot pain.  (Tr. 275.)  The plaintiff continued to have significant pain in his right foot, was taking analgesic pain medication as well as Neurontin, a medication prescribed to treat nerve pain.  *Id.*  The plaintiff had been diagnosed with Reflex Sympathetic Dystrophy (RSD) of his right foot, a chronic pain condition linked to the nervous system, had an orthotic in his shoe, and had been "released from work."[6]  Dr. Adams noted good coloration of the foot but pain with rotation.  There were no significant degenerative

---

[6]It is not clear whether Dr. Adams meant that the plaintiff had been released to return to work, or whether he meant that the plaintiff had been given time off from work.

5

changes and his osteopenia, or decrease in bone mineral density, was improving. Dr. Adams diagnosed a Lisfranc variant, or fracture of the midfoot, with continued pain complicated by RSD. He assessed that overall the plaintiff was doing "fairly well." Dr. Adams planned to take him off Lortab and Soma and switch to Elavil, a "more appropriate" chronic pain medication, presumably to ward off narcotic pain medication dependence, and continue him on the Neurontin.[7] *Id.*

The plaintiff returned to Dr. Adams for a follow up on December 6, 1999, when he reported that he continued to have chronic pain. (Tr. 275.) Dr. Adams noted that the plaintiff had applied for disability and that he had written several letters to the plaintiff's attorney, to help the plaintiff "get on disability." The plaintiff was not having problems with blueness or discoloration, but rather "mainly chronic pain." The plaintiff reported being able to stand for only a very short period of time before having pain. The doctor advised continuing to use the orthotics and provided him Ultram for pain with a warning to stay off narcotic pain medication. *Id.*

---

[7]Although Dr. Adams was apparently cognizant of potential narcotic pain medication dependence and attempted to avoid prescribing addictive drugs and/or to transition the plaintiff off of these potentially problematic drugs, Dr. Anand, the plaintiff's family physician, would continue to prescribe drugs such as Lortab.

6

On January 11, 2000, the plaintiff reported to Dr. Anand[8] for follow up and for prescriptions. (Tr. 189.) The plaintiff had been taking pain medication since having his right foot crushed and right shoulder surgery. On examination, the plaintiff's right foot had decreased range of movement, increased pain and paresthesia (tingling or numbness), and no swelling. Dr. Anand noted that the plaintiff's shoulder was better, that the plaintiff was tolerating pain, and he recommended maintaining mobility and activity, and noted that the plaintiff was "otherwise well." He prescribed Oyst Cal (a calcium supplement) and hydrocodone.

The plaintiff presented to Dr. Anand on March 1, 2000, complaining of pain in his lower back radiating into his right hip and down his right leg. (Tr. 188.) Dr. Anand recommended an MRI of the lower spine. *Id.*

On March 8, 2000, the plaintiff underwent an MRI of the lumbar spine. (Tr. 197.) The MRI revealed that the L5-S1 disc was degenerated with left lateral disc herniation that appeared to impinge on the left S1 nerve root. *Id.* The plaintiff presented to Dr. Anand on March 10, 2000, to discuss the results of his MRI and X-rays. (Tr. 188.) The plaintiff's chart noted RSD in the right foot, pain in the lower back radiating into the right leg, and treatment on five occasions with nerve blocks. This treatment relieved pain at first but the

---

[8]The physician's signature on notes of the plaintiff's visits to Dr. Anand's office are not legible so it is not clear whether Dr. Anand saw the plaintiff on each visit. For simplicity's sake, the Court has assumed that Dr. Anand was the author of all of the physician's notes referred to herein.

plaintiff reported that the pain had returned. Diagnoses included disc herniation and lower back pain, and the plaintiff was referred to a neurologist and given prescriptions for Lortab and Soma, a strong short-term pain medication for acute musculoskeletal pain. *Id.*

On April 5, 2000, the plaintiff again reported to Dr. Anand complaining of lower back pain. (Tr. 188.) He returned on April 11 with back pain seeking a refill of medications. (Tr. 187.) Dr. Anand prescribed Carisoprodol, a muscle relaxant, and Lortab. *Id.*

On April 30, 2000, the plaintiff was seen by Dr. Melvin D. Law, an orthopedist in practice with Dr. Lawrence, the doctor who performed the plaintiff's first right shoulder surgery, at Premier Orthopaedics and Sports Medicine in Nashville. (Tr. 241.) The plaintiff complained chiefly of low back pain. *Id.* He reported back pain for three years and right side leg pain that was progressively worsening, and trouble walking more than a couple of blocks. He rated his pain at an eight out of ten and reported that he used anti-inflammatories, muscle relaxants, and pain medications. The plaintiff also reported increased pain with activity, sitting, walking, riding in a car, lifting, and bending forward and backward. The plaintiff had been unemployed since June 30, 1998. He had a history of arthritis and smoking a pack of cigarettes a day. Dr. Law noted "marked limited forward flexion" of the back with fingertips two feet from the floor when attempting to touch his toes, and tenderness on deep palpation in the lumbosacral area. The plaintiff

8

exhibited a slight limp and favored his right leg. He had a history of RSD with coldness and dysesthesia, or abnormal nerve pain, in the right leg due to a crush injury. Straight leg raise on the right side caused low back pain and buttock pain. He had markedly decreased strength in his foot and lower leg muscles on the right side due to the crush injury to the foot. X-rays of the back revealed good disc space heights but a small osteophyte at the L3-4 level. Dr. Law diagnosed lumbar back pain and mechanical low back pain with no obvious abnormalities on radiographs. He recommended physical therapy and possibly a brace and an MRI. *Id.*

The plaintiff reported back to Dr. Anand on May 2, 2000, complaining of soreness in his right shoulder, and seeking a prescription for muscle relaxers and pain medications. (Tr. 187.) Dr. Anand noted bursitis, or joint inflammation, in the right shoulder and degenerative joint disease (DJD) in the lumbar spine. He ordered an X-ray of the plaintiff's right shoulder. *Id.* The X-ray on the plaintiff's right shoulder revealed no fracture or dislocation. (Tr. 196.)

On May 26, 2000, the plaintiff presented to Dr. Anand requesting a shoulder injection and a refill of muscle relaxers. (Tr. 187.) Many of the doctor's notes from this visit are illegible, but he ultimately prescribed Relafen, an anti-inflammatory drug, and Lortab. *Id.*

9

The plaintiff presented to Dr. Anand on July 19, 2000, complaining of pain in his right shoulder. (Tr. 186.) The plaintiff's chart noted that he received a cortisone injection in his shoulder on the May 26 visit, and on this visit, the plaintiff requested another cortisone shot, as well as a muscle relaxer and Lortab. The plaintiff was prescribed Clonidine due to elevated blood pressure of 140/100. *Id.*

On September 1, 2000, the plaintiff again reported to Dr. Anand for right shoulder pain with a history of surgery. (Tr. 186.) He was continued on Clonidine and Lortab, and given Vioxx. The chart noted that his back was "stable." *Id.*

The plaintiff presented to Dr. Adams on September 14, 2000. (Tr. 273.) His chart indicated that he had been working part-time prior to the office visit but was currently laid off. He was experiencing back pain, arthritis, and high blood pressure. His symptoms included morning stiffness, joint pain, muscle tenderness, muscle weakness, and difficulty sleeping. He complained of right foot pain, swelling, and redness over his foot. Dr. Adams diagnosed a midfoot injury with RSD. He prescribed Neurontin and Soma, but did not prescribe narcotic pain medication because he did not "want to get him addicted to this medication once again." *Id.*

On October 18, 2000, the plaintiff returned to Dr. Lawrence fourteen months post right shoulder surgery. (Tr. 240.) He reported doing better until he started putting shingles on a neighbor's roof, and afterwards began experiencing pain in his right shoulder

and down into his arm and elbow.  Dr. Lawrence observed tenderness over the right AC joint, mildly positive impingement, and a limited range of motion.  X-rays revealed some degenerative changes to the AC joint, and Dr. Lawrence diagnosed AC joint pain.  The plaintiff was injected with Aristospan and Marcaine in the AC joint and asked to follow up in two weeks.  *Id.*

During the plaintiff's October 24, 2000, visit, Dr. Anand noted that the plaintiff suffered right shoulder bursitis, a bulging disc in his back, RSD in his foot, and muscle spasm.  (Tr. 185.)  Prescriptions for Lortab and Vioxx were refilled, and the plaintiff was also prescribed Skelaxin, a muscle relaxant.  *Id.*

The plaintiff presented to Dr. Adams on November 13, 2000.  (Tr. 274.)  He complained of a rash over his right foot, and Dr. Adams diagnosed dermatitis of uncertain origin.  Dr. Adams prescribed hydrocortisone cream and recommended that the plaintiff see a dermatologist.  *Id.*

On December 5, 2000, the plaintiff returned to Dr. Anand experiencing right leg pain with swelling accompanied by redness going up his leg and thigh.  (Tr. 185.)  The doctor ordered a venous Doppler.  *Id.*  The Doppler test revealed no dilation or deep venous thrombosis and was normal except for an enlarged right lymph node located in the right groin.  (Tr. 193.)

11

The plaintiff's right foot pain continued through his December 29, 2000, visit, and Dr. Anand also noted a swollen lymph node in the plaintiff's right leg. (Tr. 183.) He refilled the plaintiff's prescriptions and sent him for a vascular surgery consult. Chronic foot crush injury with cellulitis, or skin infection, and limping were noted. *Id.*

On January 17, 2001, the plaintiff was seen at the Middle Tennessee Vascular Laboratory for a Doppler examination of his lower extremities. (Tr. 192.) The plaintiff presented with pain and swelling in his right foot as a result of the crushing injury to his foot the previous November. *Id.* The examination revealed no deep vein thrombosis (DVT) or thrombophlebitis (blood clots or vein inflammation) in either lower extremity. *Id.*

On January 31, 2001, Dr. Anand diagnosed the plaintiff with peripheral vascular insufficiency. (Tr. 182.) However, he had normal ABI (ankle blood pressure measurement), bilaterally, normal triphasic arterial waveforms, and no evidence of hemodynamically significant stenosis (serious narrowing of blood vessels). *Id.*

Upon examination on February 19, 2001, Dr. Anand noted muscle spasm of the legs, RSD, and chronic pain. (Tr. 181.) One month later, on March 19, the plaintiff presented seeking prescription refills and his chart reflects the presence of two cysts, including one pilonidal cyst, a painful skin infection near the tailbone. *Id.*

12

On March 19, 2001, the plaintiff returned to Dr. Adams complaining of foot pain. (Tr. 274.) The doctor noted that the plaintiff was working full duty at that time. The plaintiff had seen Dr. Shelton, a vascular surgeon, for the rash on his right foot, and Dr. Shelton diagnosed a type of infection that may be related to the plaintiff's RSD. Upon examination, however, Dr. Adams noted that the rash was "totally cleared up." Dr. Adams prescribed a new set of orthotics.[9] *Id.*

The plaintiff underwent an air contrast barium enema at Maury Regional Hospital on March 21, 2001. (Tr. 171-72.) There was no evidence of obstruction or restricting lesions. However, multiple small diverticula were present in the sigmoid colon, atypically numerous for a person of the plaintiff's age. The radiologist's impression was diffuse sigmoid colon diverticula. (Tr. 172.)

A May 28, 2001, check up with Dr. Anand's office yielded a record that is largely illegible, save for the indication that the plaintiff was continued on several prescription drugs such as Lortab, Vioxx, and Soma. (Tr. 180.)

On June 18, 2001, the plaintiff presented at the Emergency Department of Maury Regional Hospital complaining of chest pain, blurred vision, and a headache. (Tr. 162, 164, 170.) The plaintiff underwent an ECG, chest x-ray, and a series of blood tests to determine

---

[9]Dr. Adams' notes on March 19, 2001, conclude with "WORK NOTE: Continue same restrictions." Dr. Adams made similar notes on December 6, 1999, and September 14, 2000. (Tr. 273, 275.) It is not clear what Dr. Adams meant by these comments.

13

if he had suffered a heart attack. (Tr. 162, 167-68, 170.) The results of the ECG were basically normal, with a moderately enlarged cardiac silhouette, or "mild cardiomegaly." (Tr. 169-70, 167.) The plaintiff was discharged the same day and encouraged to follow up with Dr. Anand in one to two days. (Tr. 164.) The plaintiff followed up on June 20, 2001. (Tr. 179.) Dr. Anand noted chronic shoulder pain, hyptertension, and anxiety. In addition to the plaintiff's normal prescriptions, the doctor prescribed the additional drugs of Xanax, an anxiety drug, and another illegible drug. *Id.*

The plaintiff saw Dr. Adams on July 2, 2001, for evaluation of his right foot. (Tr. 271.) His exam revealed dermatitis "over his foot [and] pain over his mid foot." The plaintiff requested a new set of custom work boots, but Dr. Adams recommended simply moving his orthotics into his regular boots. Dr. Adams referred him to a dermatologist to evaluate his chronic dermatitis. The plaintiff reported that Dr. Anand had given him steroid cream but it was not very helpful. *Id.*

On July 16, 2001, the plaintiff reported for a check up with Dr. Anand, who noted left shoulder pain with crepitus, or grating, crackling, or popping, with movement. (Tr. 178.) Dr. Anand's diagnoses included left shoulder pain, hypertension, and degenerative joint disease, and he prescribed Lotensin, a blood pressure drug, Xanax, Lortab, and Soma. *Id.*

14

Notes from Dr. Anand's office on August 21, 2001, record the plaintiff's complaints of pain in his low back and shoulders. (Tr. 178.) History of low back injury with an MRI indicating left lateral disc herniation of L5-S1 was noted, along with a 1999 right rotator cuff tear and surgery. The plaintiff indicated that his left shoulder was hurting and he could not sleep on it. He reported lower back pain and spasms into his left leg. The plaintiff indicated that he was experiencing a "lot of stress," and that he was not sleeping well. The notes also indicated HNP, or a slipped disc at L5-S1. He was given samples of Wellbutrin, an anxiety medication, and referred for an MRI. *Id.*

On August 29, 2001, the plaintiff underwent a left shoulder MRI at Maury Regional Hospital. (Tr. 157-58, 191.) The findings were consistent with rotator cuff tendon tear and anterior glenoid labral tear. *Id.*

The plaintiff followed up with Dr. Anand on September 12, 2001. (Tr. 177.) The only legible portions of the notes from this visit indicate that the plaintiff's lungs were clear, that he had diagnoses of hypertension, disc bulge, and anxiety, and that he was continued on several prescriptions and referred to an orthopedist. *Id.*

On September 14, 2001, the plaintiff returned to Dr. Lawrence complaining of pain in his left shoulder. (Tr. 239.) Dr. Lawrence noted that the plaintiff's right shoulder was "doing well," but that the plaintiff complained of feeling tired, and experiencing pain and stiffness in his left shoulder. Dr. Lawrence related that the plaintiff's August 29, 2001, MRI

15

showed a rotator cuff tear of the left shoulder and a tear of the anterior glenoid labrum, as well as degenerative changes in his AC joint. He was diagnosed with a left shoulder rotator cuff tear and osteoarthritis of the left shoulder AC joint. Dr. Lawrence recommended an arthroscopy subacromial decompression rotator cuff repair and excision of the distal clavicle. Left shoulder surgery was scheduled January 4, 2002. *Id.*

The plaintiff filed an application for DIB dated September 26, 2001. (Tr. 102-04.) Due to a previously denied claim, he was precluded from alleging an onset date any earlier than February 15, 2000. (Tr. 104.)

On October 2, 2001, the plaintiff returned to Dr. Law reporting two to three weeks of increasing pain that put him in bed for a few days. (Tr. 238.) He took Motrin for the pain and was able to return to work. Dr. Law recorded restricted range of motion of the lumbar spine, mild pain with flexion and mild tenderness in the lumbar spine and lumbosacral area. Motor function was 5/5 and sensation was intact. Dr. Law prescribed Celebrex for pain and recommended a lumbosacral corset brace to wear with activities. *Id.*

On October 12, 2001, the plaintiff saw Dr. Anand for a permanent physical disability examination. (Tr. 176.) Legible notes indicate chronic shoulder and back pain, hypertension, anxiety, and bilateral rotator cuff tears (right repaired in 1999). *Id.*

The plaintiff saw Dr. Adams on October 29, 2001, for evaluation of his right foot. (Tr. 271.) The plaintiff reported getting out of the car, putting weight on his foot, and

feeling a pop about two weeks earlier. He experienced pain and swelling thereafter. He expressed anxiety about the long term effects of taking Neurontin. X-rays were negative for foot fracture, but Dr. Adams diagnosed a mild right ankle sprain. The plaintiff was placed in a tibial boot for two to three weeks, and Dr. Adams began gradual discontinuation of Neurontin. *Id.*

Upon referral from the Disability Determination Services ("DDS"), Dr. Darrel Rinehart saw the plaintiff on November 6, 2001. (Tr. 200.) He recounted the plaintiff's complaints of bilateral shoulder pain with history of right shoulder surgery. The plaintiff reported post-operative problems following his right shoulder surgery and that he was "in the process of being scheduled for a second surgery on his right shoulder." He reported being unable to use his right shoulder without pain or "use" his arm above his head, and was unable to sleep on his right side because of the discomfort. The plaintiff also complained about his left shoulder, on which surgery was scheduled on January 4, 2002. The plaintiff reported being unable to do anything with his left arm without pain. The plaintiff complained of a bad disc at L5 that caused difficulty with sitting for more than five to ten minutes as well as difficulty standing. He estimated he could walk up to a half a mile but no further. *Id.* The plaintiff reported a crushing injury to his right foot in 1998. (Tr. 201.) Following this injury, the plaintiff developed reflex sympathetic dystrophy that

Case 1:06-cv-00036   Document 21   Filed 03/28/08   Page 17 of 73 PageID #: 84

resulted in a lot of pain and swelling in that foot. His current medications at the time of exam included Clonidine, Alprazolam, Soma, Lortab, and Neurontin.

With respect to his social history, Dr. Rinehart noted that the plaintiff finished eleventh grade and had done some part time farm work but had not been steadily employed since 1998. He is married with two children, two living parents, and five living siblings. On physical exam, the plaintiff was able to abduct both shoulders to ninety degrees, but with a lot of pain on both sides, greater on the right than the left. Both shoulders extended approximately forty-five degrees with flexion on both sides to about seventy-five to eighty degrees. Range of motion in his hands, wrists, shoulders, feet, ankles, knees, and hips was normal. The plaintiff walked with a slight limp, favoring his right leg. *Id.*

Dr. Rinehart concluded that given the plaintiff's history of bilateral shoulder pain with rotator cuff disease, lumbar degenerative disc disease, history of crush injury to the right foot with subsequent reflex sympathetic dystrophy and chronic pain, the plaintiff would be extremely limited with respect to activities like sitting, standing, lifting, walking, and the like. (Tr. 202.) Dr. Rinehart concluded that these activities would be limited to not much more than even intermittently over a two to three hour period in an eight hour workday. *Id.*

18

On November 8, 2001, the plaintiff returned to Dr. Lawrence continuing to complain of pain in his left shoulder. (Tr. 237.) He reported popping and grinding in the right shoulder without a lot of pain. Dr. Lawrence obtained an arthrogram of the right shoulder and injected the shoulder with Marcaine and air. He noted that the rotator cuff appeared to be intact but recommended an MRI arthrogram of the right shoulder to determine whether the plaintiff had a recurrent tear of his rotator cuff. *Id.*

Dr. Deborah Doineau, Ed.D., examined the plaintiff on behalf of DDS on November 28, 2001. (Tr. 203-07.) The plaintiff was referred to Dr. Doineau for a psychological evaluation based on allegations of "nerves and anxiety." The plaintiff was accompanied by his spouse, who also provided information. Dr. Doineau noted that the plaintiff demonstrated adequate hygiene but below average grooming, and particularly poor teeth. She observed that he was only an average historian but that he did not appear to misrepresent his condition. Although he has a driver's license, the plaintiff's wife drove him to the appointment due to the plaintiff's difficulty using his right foot on the gas pedal because of his crushing injury to that foot. His shoulder pain also caused him problems operating the stick shift. His medications rendered him drowsy.

He reported being married with two children, ages 22 and 18. (Tr. 205.) The plaintiff's wife was unemployed and receiving disability benefits. The family resided in

a rented house owned by a relative, and received heating bill assistance and food stamps. *Id.*

The plaintiff reported that he crushed his foot at work in 1998. (Tr. 203.) Since that time, he developed a degenerative spine disease. (Tr. 204.) The plaintiff was unable to stand for any length of time on his right foot, had back problems, a history of surgery on his right shoulder with scheduled surgery on his left shoulder, and had been out of work since 1998. He reported trying to work but being unable to function. He was taking Carisoprodol (muscle relaxant), Clonidine (blood pressure), Norco (narcotic pain reliever),[10] Alprazolam (anxiety), Celebrex (anti-inflammatory), and Neurontin (neuropathic pain). (Tr. 204.)

Dr. Doineau related that the plaintiff's wife had taken him to a mental health center in 1999. He was seen once but then refused to see a psychiatrist. The only other mental health treatment has involved his primary care physician prescribing "nerve medications" for approximately three years to help him sleep. The plaintiff had no history of hospitalization for emotional problems and had never attempted suicide, but he thought about it after his injury. Immediately following his accident, the plaintiff's foot was in a cast for six months, and he reported that he did not think "he could stand it." He had

---

[10]A typographical error in Dr. Doineau's report actually identifies this drug as "Narco," but no such drug exists. The reference was likely to Norco, a form of hydrocodone consistent with the plaintiff's symptoms and prescription history.

Case 1:06-cv-00036   Document 21   Filed 03/28/08   Page 20 of 73 PageID #: 87

never been to the emergency room for panic attacks and had no history of drug or alcohol abuse. He had no family history of mental illness. *Id.*

Despite quitting school in the twelfth grade for reasons he did not recall, the plaintiff could read adequately without assistance. He reported obtaining his GED in 1991. He received on-the-job training in welding, blueprint reading, plumbing, and tow motor driving. The plaintiff's work history included construction, factory work, and farm work. His last job was at Murray Ohio, where his injury occurred. The plaintiff received a workers' compensation settlement arising out of that on-the-job injury. *Id.* Despite the fact that his doctor put him on light duty, the plaintiff reported being unable to perform any of the jobs at the Murray Ohio plant. (Tr. 204-05.) He reported doing whatever he could do since that time to support his family. (Tr. 205.) Dr. Doineau noted that the plaintiff reluctantly admitted that he was working part time on his neighbor's farm gathering eggs and watering and feeding the chickens. He stated that he was paid "a little," and was only able to work this job due to the very flexible hours and pace of the work. He indicated that he had loved his job at Murray Ohio, and was paid well and got good benefits.

Dr. Doineau performed a mental status evaluation and found the plaintiff to be clear, coherent, and goal-directed. She observed that his memory was grossly intact. He was mildly anxious, and the plaintiff described his mood during the exam as "kind of depressed and angry." He complained of pain in his shoulders. Dr. Doineau observed that

he was not suicidal, homicidal, or experiencing hallucinations, and she estimated that his IQ was above mental retardation range.

The plaintiff reported being upset over his injuries and feeling that he was treated unfairly. He had a lot of pain in his back and shoulders and felt that he deserved disability benefits. He complained of insomnia, waking up in pain, and worrying about bills. He reported gaining fifty pounds because he was unable to exercise. He related that his pain was distracting and affected his concentration. *Id.* The plaintiff used to enjoy coon hunting, fishing, and other outdoor sports, but was unable to participate in these hobbies due to his physical limitations. (Tr. 205-06.) He owned a $4,000 coon dog and most of his friends were coon hunters, and he was unable to use his dog or interact with his group of friends. (Tr. 206.)

The plaintiff described his activities of daily living as including waking up at 6:00 a.m., drinking coffee and smoking cigarettes. He would go the poultry farm, feed and water the chickens and collect eggs, and then return home and lie on the couch. He ate lunch around 2:00 p.m., watched TV, watered his dogs, and did chores that his wife requested as he was able to do them. He sometimes visited his mother at a local nursing home. He could sometimes pick up clothes around the house and help make supper. The plaintiff described bad days when his shoulder hurts and really bad days when he was unable to get comfortable at all. A good day consisted of his pain being less and his mood

being better.  His wife read the mail, paid the bills, and made a lot of the decisions.  The plaintiff reported socializing with family members and going to church occasionally.  He could drive short distances if he had not taken his medications.  He raised coon dogs in his spare time but could not participate in his former outdoor hobbies.

Dr. Doineau concluded that the plaintiff could interact appropriately with others, understand instructions, maintain an adequate level of hygiene, use public transportation, and adapt.  However, she noted a mild to moderate impairment in his ability to concentrate consistently, and his persistence was hampered by his physical condition.  (Tr. 206.)  She diagnosed a depressive disorder not otherwise specified with symptoms of anxiety, crushed foot, back problems, history of right shoulder surgery, shoulder pain, and other medical complaints.  (Tr. 207.)

On November 29, 2001, the plaintiff reported to Dr. Lawrence with right shoulder pain at 5 out of 10.  (Tr. 237.)  An air arthrogram showed degenerative changes of the humeral head with some fraying of the superior labrum.  It appeared that he might have a defect at the rotator cuff internal with small full thickness.  The supraspinatis showed mild tendinitis.  *Id.*

Dr. Shannon Tilley performed a *Drummond* case analysis on December 21, 2001.[11]
(Tr. 208-09.) Dr. Tilley noted that the ALJ's restrictions still applied because the only change is that the plaintiff's condition was now in both shoulders. (Tr. 209.) She indicated that significant change had not occurred. She completed a Capacity Assessment dated the same day. (Tr. 210-17.) She found that the plaintiff could lift fifty pounds occasionally and twenty-five pounds frequently, stand/walk at least two hours in an eight hour day, sit about six hours in an eight hour day, and was limited in pushing/pulling with the upper extremities. (Tr. 211.) She limited kneeling and crawling to occasionally, but climbing, balancing, stooping, and crouching could be performed frequently. (Tr. 212.) She limited overhead reaching, but handling, fingering, and feeling were unlimited. There were no visual limitations noted. (Tr. 213.) Communication was unlimited, and there were no environmental limitations noted except "hgts," which may refer to a limitation on heights, though the box next to "hazards," including heights, was marked unlimited. (Tr. 214.) Dr. Tilley noted that there were treating/examining sources in the file that contained conclusions about the plaintiff's limitations/restrictions that were significantly different from her findings. However, rather than explain these conflicts, she referred to the *Drummond* analysis, the first page of which is illegible due to a very poor copy. (Tr. 216.)

---

[11]In *Drummond v. Commissioner*, 126 F.3d 837, 840-843 (6th Cir. 1997) (issued as Acquiescence Ruling 98-4(6)), the Court held that, absent evidence of medical improvement, *res judicata* required a finding that a claimant previously denied benefits as a younger worker capable of sedentary work was still limited to sedentary work.

24

A December 27, 2001, note from Dr. Lawrence and Dr. Law's office indicated that the plaintiff called complaining of more pain in his right shoulder than in the left. (Tr. 237.) He postponed his left shoulder surgery, scheduled for January 4, 2002, pending his return for a recheck on the right shoulder.

On January 8, 2002, a non-examining, consultative DDS physician completed a Mental Residual Functional Capacity Assessment.[12] (Tr. 218-20.) Understanding and memory were marked "not significantly limited." (Tr. 218.) Under the category of sustained concentration and persistence, most categories were marked "not significantly limited," but his ability to maintain attention and concentration for extended periods and his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances were marked "moderately limited." *Id.* All items under the categories of social interaction were "not significantly limited," as were categories under adaptation. (Tr. 219.)

The same DDS physician completed a Psychiatric Review Technique form also dated January 8, 2002, which indicated the medically determinable impairment of depressive disorder not otherwise specified with anxiety. (Tr. 224.) Under Listing 12.04, Affective Disorders, the DDS physician indicated that the plaintiff experienced a mild degree of limitation in restriction of activities of daily living and difficulties in maintaining social

---

[12]The signature on this evaluation is illegible. However, the ALJ attributed the assessment to Frank Kupstas, Ph.D., in his July 25, 2005, decision. (Tr. 24.)

functioning, moderate limitations in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Tr. 231.) None of these degrees of limitation were severe enough to satisfy the functional criterion. *Id.* The physician further noted that the evidence did not establish the presence of "C" criteria.[13] (Tr. 232.) The physician noted that the plaintiff presented with multiple physical problems that may exacerbate psychological symptoms, but that the plaintiff was able to perform a wide range of activities of daily living with moderate restrictions in persistence and pace. (Tr. 233.)

On January 11, 2002, the plaintiff returned to Dr. Lawrence, advising that he had cancelled his left shoulder surgery due to pain on the right side of his neck in the trapezial area. (Tr. 236.) The plaintiff reported that the right shoulder itself felt good, with the real pain in the trapezial muscle. He complained of stiffness in his neck with range of motion causing pain in the trapezial area. His left shoulder had positive impingement. X-ray of his cervical spine showed some mild cervical and degenerative disc disease. After a "long time talking about [the plaintiff's] neck and shoulders," Dr. Lawrence and the plaintiff

---

[13]The "C" criteria for listing 12.04, Affective Disorders, consist of any one of the following: "[r]epeated episodes of decompensation, each of extended duration," or "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate," or "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement." (Tr. 232.)

26

decided to "hold off" on surgical intervention.  Dr. Lawrence noted diagnoses of cervical degenerative disc disease and left shoulder rotator cuff tendinitis.  *Id.*

The plaintiff's claim for disability benefits was denied on January 25, 2002.  (Tr. 40-42, 56-60.)  The plaintiff filed a request for reconsideration on March 29, 2002.  (Tr. 61, 147-50.)

On May 8, 2002, Larry Welch, Ed.D., a non-examining, consultative DDS examiner, filled out a Mental Residual Functional Capacity Assessment.[14]  (Tr. 242.)  He concluded that the plaintiff was not significantly limited in any subcategory of understanding and memory.  In the area of sustained concentration and persistence, Dr. Welch indicated that the plaintiff was moderately limited in the ability to maintain attention and concentration for extended periods and the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  *Id.*  All other subcategories of concentration and persistence were marked not significantly limited.  (Tr. 242-43.)  All subcategories of social interaction and adaptation were marked not significantly limited.  (Tr. 243.)  Dr. Welch concluded that the plaintiff was able to understand, remember, and carry out a full range of work activities; he was able to sustain concentration over extended periods for simple tasks, while detailed tasks gave him some

---

[14]With the exception of slightly different phrasing under the "Consultant's Notes" section of the pre-printed DDS form, this Mental RFC Assessment form is identical to a form filled out by another DDS physician on January 8, 2002.  (Tr. 218-34.)  The January assessment was attributed by the ALJ to a Frank Kupstas, Ph.D.  *See infra* n.12.

difficulty due to chronic pain; he was able to maintain socially acceptable behavior with coworkers, supervisors, the general public, and his peers; and he experienced no problems with workplace adaptation. (Tr. 244.) Finally, the examiner noted that the plaintiff appeared to have "some difficulty" coping with his physical impairments. *Id.*

Dr. Welch also filled out a Psychiatric Review Technique form on the same day, indicating a depressive disorder not otherwise specified with anxiety. (Tr. 245, 248.) He indicated a mild degree of limitation for activities of daily living and difficulties in maintaining social functioning. (Tr. 255.) Dr. Welch noted a moderate degree of limitation in the area of maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. None of these limitations was severe enough to satisfy the functional criteria under the relevant listing. *Id.* Dr. Welch indicated that the evidence did not establish the presence of the "C" criteria. (Tr. 256.) Dr. Welch quoted several findings from Dr. Doineau's November 28, 2001, examination. (Tr. 257.)

On May 16, 2002, Dr. Denise Bell, a non-examining, consultative physician, completed a Physical RFC Assessment. (Tr. 259-64.) She indicated a primary diagnosis of Lisfranc's fracture of the right foot with a secondary diagnosis of degenerative disc disease of the spine and shoulder problems. (Tr. 259.) Dr. Bell assessed that the plaintiff could lift/carry ten pounds occasionally and less than ten pounds frequently. The plaintiff could stand/walk at least two hours in an eight hour workday, sit about six hours in an eight hour

28

workday periodically alternating sitting and standing to relieve pain or discomfort, and pushing/pulling was limited in the upper extremities. (Tr. 260.) Under "Explanation of Exertional Limitations," Dr. Bell noted that the ALJ found that the plaintiff's allegations regarding his limitations were not totally credible, and although the evidence established underlying medical conditions capable of producing some pain and other symptoms, substantial evidence did not support a conclusion that his medically determinable impairments were of such severity that they could reasonably be expected to give rise to disabling pain and other symptoms.[15] (Tr. 260-61.)

Dr. Bell noted that the plaintiff could never climb, could only occasionally balance, kneel, crouch, and crawl, and could frequently stoop. (Tr. 261.) Reaching was limited in all directions including overhead, with "occasional reaching on right." *Id.* There were no visual or communicative limitations. (Tr. 262.) Dr. Bell opined that the plaintiff should avoid all exposure to hazards such as machinery, heights, etc. (Tr. 263.) Finally, Dr. Bell indicated that there was a treating or examining source statement regarding the plaintiff's physical capacities in the file and that those conclusions were not significantly different from her findings. (Tr. 264.) Dr. Bell referred numerous times in the RFC Assessment to

---

[15]Dr. Bell must have been referring to the ALJ's decision on the plaintiff's prior application.

29

the *Drummond* analysis.[16]  The *Drummond* analysis is dated May 21, 2002, was completed by Dr. Bell, and consists of two pages, the first of which is largely illegible due to a very poor copy.[17]  (Tr. 265-66.)  On the second page, the blank next to "significant change did not occur," is marked, with the brief explanatory note, "ALJ restrictions continues [sic] to be reasonable now with bilateral shoulder impairment."  (Tr. 266.)

On May 21, 2002, the plaintiff's claim for disability benefits was denied upon reconsideration.  (Tr. 43-44, 63-64.)  On August 8, 2002, the plaintiff filed a request for a hearing before an ALJ.  (Tr. 65.)  A hearing was held on February 2, 2004.  (Tr. 312-53.)

Dr. Adams performed a Medical Assessment to do Work-Related Activities on March 17, 2003.  (Tr. 268-70.)  Dr. Adams indicated that lifting/carrying were affected and that the plaintiff could lift/carry up to thirty pounds occasionally and twenty pounds frequently.  (Tr. 268.)  These limitations were attributed to the plaintiff's painful right shoulder, and Dr. Adams also noted that carrying was limited due to the plaintiff's right foot injury and resulting reflex sympathetic dystrophy.  Standing and walking were also limited to five hours in an eight hour day and 2 hours uninterrupted due to the plaintiff's

_____

[16]*See supra* n.8.  It is also noteworthy that, despite the fact that Dr. Bell refers consistently to the *Drummond* analysis in her RFC assessment, the *Drummond* analysis is dated five days after the RFC Assessment.  (Tr. 264, 266.)

[17]The earlier *Drummond* analysis completed by Dr. Shannon Tilley on December 21, 2001, also has an almost completely obliterated first page as well as findings on the second page nearly identical to the *Drummond* analysis completed by Dr. Bell six months later.  (Tr. 208-09, 265-66.)

foot problems. *Id*. Sitting was not affected. (Tr. 269.) Postural activities such as climbing, balancing, etc. were limited to occasionally. Reaching and pushing/pulling were affected, but handling, feeling, seeing, hearing, and speaking were not. Dr. Adams noted right shoulder pain and surgery. There were no environmental restrictions indicated. *Id.*

The plaintiff presented to Dr. Adams on April 21, 2003, complaining of neck pain. (Tr. 282.) The plaintiff had been to three or four therapy sessions. Examination revealed tenderness along the paraspinal muscles, especially the trapezius and the levator scapula muscles. Dr. Adams diagnosed myofascial neck pain, recommended that the plaintiff finish physical therapy, and noted that the plaintiff should not work for three weeks. *Id.*

The plaintiff returned to Dr. Adams on May 15, 2003, continuing to experience neck pain with no improvement. (Tr. 281.) An MRI was normal with no signs of disc herniation or rupture. Examination revealed some tenderness. Dr. Adams referred the plaintiff to Dr. Ashley for management of his neck pain and to determine if he were a "candidate for an injection."

The plaintiff presented to Dr. Christopher Ashley, a physical medicine and rehabilitation specialist, on June 12, 2003, complaining of right shoulder pain. (Tr. 279-80.) The plaintiff was not working at that time. The plaintiff was referred for treatment of myofascial pain. The plaintiff described a lot of pain in his right shoulder, problems with his rotator cuff, pain near the shoulder joint, up the back of his neck, down into his arm and

31

into his hand.  Pain worsened with mowing the yard or overhead use.  Physical therapy only helped temporarily.  Upon examination, the plaintiff had some pain with motion, and some taut tender bands in his upper shoulder with some trigger points in his right levator scapula, his right upper trapezius and his right rhomboids.  The plaintiff was injected with Marcaine and Lidocaine in three trigger points.  Dr. Ashley sought approval from the plaintiff's insurance company for coverage for Botox injections.  *Id.*

The plaintiff returned to Dr. Adams on July 14, 2003, for follow up for his neck. (Tr. 278.)  He continued to have pain.  The plaintiff reported very little improvement from Dr. Ashley's injections of Marcaine and Lidocaine.  The plaintiff's insurance would not cover the recommended Botox injections prescribed by Dr. Ashley.  Examination by Dr. Adams revealed trigger points and muscle spasm along his neck and down into his arm.  His left shoulder revealed mechanical popping.  Dr. Adams diagnosed myofascial pain with trigger points of the cervical spine, along with impingement left shoulder syndrome. Dr. Adams refilled his medication and told the plaintiff he would have to "wait this out."  He recommended a lot of massage, heat, and ice at home.  *Id.*

Dr. Adams saw the plaintiff again on August 25, 2003.  (Tr. 277.)  The plaintiff reported numbness and tingling in his arm and little finger with decreased grip strength.  His previous MRI was negative, but examination showed tenderness over his nerves to palpation, positive Tinel's at the elbow.  Dr. Adams diagnosed ulnar neuropathy, or

entrapment of the ulnar nerve with resultant numbness and tingling into the fingers. Dr. Adams recommended an EMG and nerve conduction study and refilled his medications. *Id.*

On September 25, 2003, the plaintiff underwent an EMG, a technique for evaluating properties of muscles, and a nerve conduction study on his arm at the Middle Tennessee Bone and Joint Clinic. (Tr. 287.) On October 6, 2003, the plaintiff returned to Dr. Adams for explanation of his test results. At that time, the plaintiff was not working and the plaintiff reported bilateral shoulder pain. The plaintiff's test results suggested cubital tunnel syndrome. No nerve damage was present. His right shoulder was "feeling very well from his surgery," but the plaintiff's left shoulder was "killing him." The plaintiff expressed interest in scheduling left shoulder surgery. Dr. Adams noted a previous MRI which indicated a rotator cuff tear of the left shoulder but there was apparently never any surgical intervention. Examination showed pain with impingement of his shoulder, tenderness over his AC joint, pain with cross arm movement, and weakness on testing supraspinatus.

Dr. Adams diagnosed the plaintiff with cubital tunnel syndrome and a rotator cuff tear secondary to impingement with a component of AC arthritis. Dr. Adams discussed surgical options for the plaintiff's left shoulder and the plaintiff agreed that he wanted to proceed with an arthroscopy, subacromial decompression, AC resection and possible mini

open rotator cuff repair of the left shoulder. Dr. Adams also made a note to refer the plaintiff to Dr. Moore for evaluation of the his elbow to determine if he were a candidate for ulnar nerve transposition. *Id.*

On October 20, 2003, the plaintiff returned to the Bone and Joint Clinic complaining of numbness in his hand. (Tr. 286.) The plaintiff reported numbness and tingling in his little finger worse at night. Dr. Kenneth Moore saw the plaintiff that day and reviewed his previous nerve conduction study, which revealed mild changes of the ulnar nerve, but not severe changes. Dr. Moore recommended that the plaintiff sleep in a night splint to delay surgery. Dr. Moore opined that the plaintiff would need ulnar nerve transfer due to the fact that his nerve subluxates, or dislocates. *Id.*

The plaintiff underwent left shoulder surgery on October 28, 2003. (Tr. 286, 283-84.) Dr. Adams performed an arthroscopy with subacromial decompression and AC resection and inserted a pain pump for post operative pain. (Tr. 283-84.)

He returned to the Bone and Joint Clinic on December 11, 2003, six weeks post surgery. (Tr. 285.) Dr. Adams saw the plaintiff and opined that he was "making fairly good progress with his shoulder," although he was still very sore and did not have a full range of motion. Dr. Adams recommended that the plaintiff continue on a home exercise program and return in one month.

On December 29, 2003, the plaintiff underwent an intake assessment at Centerstone Community Mental Health Center. (Tr. 293-94.) He appeared with his wife and complained of depression, anxiety, and inability to sleep. He had a history of pain medications and shoulder surgeries, reported still grieving after his brother's death in 1999, and sought medications for depression. (Tr. 293.) The intake assessment listed a supportive family, fair adaptive function, and no history of physical or sexual abuse. *Id.* Centerstone also completed a Clinically Related Group form on December 29, 2003 (Tr. 289-91), which reflected that the plaintiff's activities of daily living were moderately limited, with the plaintiff reporting that his wife and children had to assist with all out of home activities. (Tr. 289.) His interpersonal functioning was moderately limited in that his interactions were noted to be limited to immediate family. Concentration, task performance, and pace were mildly limited. The assessment noted that the plaintiff was focused on his disability. (Tr. 290.) There were no extreme problems noted with respect to adaption to change; this category was rated as only mildly limited.

Centerstone concluded that the plaintiff did not have a current severe impairment, although he had experienced periods of severe impairment in the past, and indicated that the plaintiff needed mental health services to prevent relapse. *Id.* The plaintiff was evaluated as belonging in Group 3, or persons who are formerly severely impaired. (Tr. 291.) The plaintiff's Global Assessment of Functioning ("GAF") was currently assessed

35

at 50, was 50 at its highest point in the last six months, and was also 50 at the lowest point of the last six months.[18] *Id.*

On January 12, 2004, the plaintiff saw Dr. Adams two months post-left shoulder surgery. (Tr. 303.) He was noted to be "making fairly good progress," but was still "fairly sore." Examination showed good motion and improving strength. Dr. Adams refilled his prescriptions, and recommended follow up in six weeks and continued work on exercises and strengthening. *Id.*

On January 13, 2004, Centerstone produced a DSM diagnosis. (Tr. 292.) The primary diagnosis was dysthemic disorder, late onset, without atypical features. The plaintiff's multiple shoulder surgeries were listed, as were his "economic problems." His GAF was listed at 50 beginning on December 18, 1998. *Id.*

On January 29, 2004, the plaintiff presented to Dr. Adams with foot pain. (Tr. 304.) The plaintiff was experiencing foot pain and redness over his foot, and demonstrated pain with stressing his midfoot. He had fairly good flexion of the heel. Dr. Adams noted a chronic mid-foot sprain, prescribed a new set of orthotics, refilled his pain medication and muscle relaxer, and gave him some Mobic, a non-steroidal anti-inflammatory drug. *Id.*

---

[18]The GAF scale is used to assess the social, occupational, and psychological functioning of adults. A GAF of 50 falls within the range of serious symptoms or serious impairment in social, occupational, or school functioning.

The plaintiff had a hearing before ALJ William Taylor on February 2, 2004. (Tr. 312-53.) The plaintiff was present and testified, and he was represented by counsel. (Tr. 312.) Vocational Expert ("VE") Dr. Gordon Doss also testified. *Id.*

On February 19, 2004, the plaintiff underwent an MRI on his spine in the lumbar region. (Tr. 298.) The MRI revealed normal vertebral body height, alignment, and marrow signal. There were mild disc changes of facet joints, a small left paracentral disc herniation with mild posterior displacement of the left S1 nerve root but no evidence of central canal stenosis or significant nerve root impingement. Mild disc bulge and facet degenerative changes were present at L4-5. *Id.*

On February 23, 2004, the plaintiff returned to Dr. Adams with bilateral arm pain. (Tr. 305.) He reported continuing pain in his right upper extremity. Although an ulnar nerve transportation had been recommended, the plaintiff had not decided whether or not to pursue this option. The plaintiff said that he had tried working, but had not been able to work because of pain. Examination revealed "fairly good motion of the left shoulder" with some pain, but his right shoulder was painful with motion and he had tenderness over the shoulder. He exhibited a positive Tinel's sign at the elbow. Dr. Adams noted diagnoses of cubital tunnel syndrome, myofascial posterior shoulder pain, and chronic Lisfranc's injury. Dr. Adams further opined, "I think he is a candidate for disability because he has both involvement in his upper and lower extremities and it is going to make

37

it very difficult for him to return to gainful employment based on the combination of problems that he has." *Id.* Dr. Adams filled out a prescription pad sheet summarizing the plaintiff's conditions. He wrote, "Patient has chronic severe pain secondary to right arm - has had right shoulder surgery, has cubital tunnel syndrome. Has had left shoulder surgery and has chronic pain secondary to midfoot Lisfranc's injury with post traumatic arthritis." (Tr. 296, common abbreviations spelled out.) The plaintiff's attorney immediately submitted this note to the ALJ via a letter dated the same day. (Tr. 295.) The ALJ would later rely upon this note in determining the onset-of-disability date of February 23, 2004.

On March 19, 2004, the plaintiff's attorney sent a copy of the February 19, 2004, MRI results to the ALJ in order to supplement the record. (Tr. 297.)

On April 28, 2004, the plaintiff saw Dr. Adams, complaining of left shoulder pain. (Tr. 306.) While operating a weed eater, the plaintiff had aggravated his shoulder. Examination showed good motion, good strength, and no mechanical popping. X-rays revealed good decompression, good AC resection, and no heterotopic ossification. Dr. Adams diagnosed impingement syndrome of the left shoulder, and suspected rotator cuff tendinitis from overuse that would "settle down." *Id.*

The ALJ issued an unfavorable decision on June 25, 2004. (Tr. 45-47, 48-55.) The plaintiff requested review of the ALJ's unfavorable decision on August 24, 2004. (Tr. 77-

89.)     On September 2, 2004, the plaintiff presented to Dr. Adams complaining of severe

left shoulder pain that began about two weeks prior to his visit.  (Tr. 307.)  Although all of

Dr. Adams' previous notes indicated that the plaintiff was not working, his notes on this

visit indicated that the plaintiff was working part-time.  The plaintiff reported that his pain

traveled all the way down to his hand and that it was a burning type pain.  On

examination, Dr. Adams found that the plaintiff had limited motion of his neck.  He had

some tenderness over his nerves on palpation, but his shoulder showed good motion,

strength, and no crepitation.  Dr. Adams suspected a cervical radiculopathy unrelated to

his previous shoulder surgery.  He recommended an MRI of the plaintiff's neck.  *Id.*

The plaintiff underwent an MRI on September 3, 2004.  (Tr. 310.)  Findings included

normal vertebral body height, marrow signal, and alignment.  There was minimal posterior

osteophyte versus ossification of the posterior longitudinal ligament without evidence of

disc herniation or canal stenosis along C2-3.  C3-4 and C4-5 was normal.  C5-6 exhibited

broad-based posterior disc bulge and osteophyte but no canal stenosis.  C6-7 and C7-T1

were normal.  The spinal cord and cervicomedullary junction were normal.  *Id.*  There were

mild spondylitic changes but no evidence of disc herniations, canal stenosis, or neural

foraminal narrowing.  (Tr. 310-11.)

The plaintiff saw Dr. Adams on September 17, 2004.  (Tr. 308.)  He was not working

and complained of neck pain.  Dr. Adams noted that the MRI did not show any signs of

nerve impingement, although it did reveal a slight bulge at C5-6. The plaintiff was "feeling a little bit better." He had fairly good motion of his neck and less tenderness over his nerves. Dr. Adams diagnosed discogenic cervical pain, refilled his medications, and recommended follow up in eight weeks. *Id.*

On September 29, 2004, the Appeals Council issued an order vacating the June 25, 2004, decision of the ALJ denying benefits to the plaintiff, and remanding the case for further consideration. (Tr. 20, 29, 91-94.) Specifically, the Appeals Council remanded the plaintiff's case for further evaluation of his mental impairment and subjective complaints, to give further consideration to the treating, examining and non-examining source opinions, to the plaintiff's maximum residual functional capacity, and if warranted, to obtain supplemental evidence from a VE. (Tr. 93-94.) Further, the ALJ was instructed to offer the plaintiff the opportunity for another hearing. (Tr. 94.)

On January 10, 2005, the plaintiff's attorney submitted additional medical records from Dr. Adams and MRI results to be placed in the plaintiff's file. (Tr. 302-11.)

The plaintiff had a second hearing before ALJ William Taylor on January 26, 2005. (Tr. 354-88.) The plaintiff was present and testified and represented by his attorney. VE Gordon Doss again testified. (Tr. 354.)

The plaintiff received a notice of a partially favorable decision on July 25, 2005. (Tr. 16-18.) The ALJ essentially found that the plaintiff was under a disability beginning

February 23, 2004, and he was entitled to SSI benefits based on his application filed September 26, 2001. (Tr. 26.) However, the ALJ found that the plaintiff was not eligible for DIB since his date last insured was December 31, 2003. *Id.* The plaintiff filed a request for review of the hearing decision on September 21, 2005. (Tr. 10-15.) The Appeals Council denied the plaintiff's request for review on March 28, 2006. (Tr. 7-9.)

### B. Hearing Testimony: The Plaintiff and a Vocational Expert

### 1. February 2, 2004, Hearing

The plaintiff's attorney explained that a previous application for benefits in 1999 resulted in a finding that he was limited to sedentary work, and he was denied benefits. (Tr. 315.) Since that time, the plaintiff experienced additional problems and surgeries, including the involvement of both shoulders as opposed to just one, as well as diagnoses of degenerative disc disease and other problems not present in 1999, including problems with depression. *Id.*

In response to questions posed by the ALJ, the plaintiff testified that he was forty-four years old at the time of the hearing, and that he graduated from high school. (Tr. 316.) He could read and write in English, perform simple math, had a driver's license, smoked two cigarettes per day, did not drink or use drugs, and had not worked in over a year. (Tr. 317.) The plaintiff's last job was laying carpet in 2003, which he performed for about

four days before stopping due to the pain. (Tr. 318.) The plaintiff's last full-time job was in 1998 when he got hurt on the job. After being hurt on the job, the plaintiff did general farm work on a neighbor's farm for approximately one year. *Id.* He moved cows by herding them with a vehicle, fed cows, and did a little repair work on fences. (Tr. 319.)

The ALJ next questioned Dr. Doss about the plaintiff's past work. (Tr. 320.) The VE classified the plaintiff's past jobs as performed by the plaintiff as follows: dump truck driver, medium and unskilled; industrial maintenance mechanic, medium and skilled; operator at a sawmill, light and semi-skilled; farming/feeding and watering chickens, medium and unskilled; and farm helper, medium and unskilled. *Id.*

Next, the plaintiff's attorney asked the plaintiff questions about his disability. (Tr. 321.) While working at Murray Ohio as an industrial maintenance mechanic, the plaintiff had his foot crushed on the job. He worked there from 1991 through 1998, full-time and worked three years part-time on a training basis. *Id.* The plaintiff graduated from high school in 1978 and worked almost continuously until his injury in 1998. (Tr. 322.) He had no vocational training, but learned about maintenance on the job at Murray Ohio. Before working as a mechanic, he worked on the assembly line and occasionally operated a tow motor. He operated a dump truck during the time that he worked for Tennessee Central Lumber Company in about 1985. *Id.*

Even prior to the crushing injury to his foot, the plaintiff had pain in both shoulders. The plaintiff reported two surgeries on his right shoulder and surgery on his left shoulder in October 2003, performed by Dr. Jeffrey Adams, his treating orthopedic surgeon. *Id.* The plaintiff was able to work with his shoulder problems for a couple of years, and he tried to return to work following his foot injury, but he was laid off. (Tr. 324.) After the lay off and due to his restrictions, there were no jobs available for him at Murray Ohio. He worked part time in the tool room while he was on crutches, but could not stand for much more than an hour and experienced a lot of swelling.

He was still having problems with his foot at the time of his testimony. *Id.* The plaintiff reported swelling, RSD, and discoloration if he stood on it too long. (Tr. 325.) He testified that his doctors had instructed him to elevate the foot if swelling occurs. *Id.* He explained that the RSD began after the crushing injury to his foot (Tr. 326), and described the pain as feeling blood pooling in the foot with throbbing pain as if his foot was going to burst. He reported taking medication for the pain as well as using heat and ice to reduce the swelling. He testified that he experienced this problem on a daily basis, but mostly on days when he was standing a lot. The pain medication helped to a certain extent but did not take away all pain. *Id.* The plaintiff testified that he could function until his foot "starts bothering" him and then he has "to quit." (Tr. 327.)

He had his first shoulder surgery on his right shoulder in 1999 to repair his rotator cuff. His second shoulder surgery was approximately two years later, again on the right shoulder. The plaintiff is right-handed. He had left shoulder surgery done in October 2003. *Id.* At the time of the hearing, the plaintiff testified that all the surgeries and therapies have still not helped his shoulders. (Tr. 328.) The plaintiff reported that it hurts him to raise his right arm at a certain, demonstrated point, he experiences numbness in his right hand, and does not have a good grip. The plaintiff testified that he was "not supposed" to pick up even a gallon of milk with his right hand since it would result in pain down his neck and shoulders. The plaintiff reported that his left shoulder was "doing better" than his right, but he did not think that the surgery had repaired his left shoulder. *Id.* The plaintiff had not been released from his prior shoulder surgery and his doctor had not yet been able to evaluate the effect of that surgery. (Tr. 329.) Raising his left arm over his head caused the plaintiff pain.

The plaintiff also related problems sleeping and expressed frustration with not being able to find work. He also described his back problem beginning in about 1980, and testified that he had degenerative disc disease and a bulging disc. (Tr. 330.) He explained that these conditions caused a lot of pain and difficulty bending over and picking things up and climbing a ladder. The plaintiff also suffered from high blood pressure, which was treated with medication. *Id.*

44

Since 2000, the plaintiff testified that he tried to return to work, but was in too much pain to work. (Tr. 331.) The previous ALJ listed jobs that the plaintiff could do, such as grocery store clerk, but the plaintiff explained that he had not applied for those jobs because it was not his "line of work," and that he had not pursued rehabilitation training. *Id.*

The plaintiff described his problems sleeping. (Tr. 332.) He was able to sleep a couple of hours a night and then shoulder pain, neck pain, and headaches would wake him up and prevent him from going back to sleep. *Id.* He testified that he normally tried to go to bed about 9:00 p.m., would be awakened at 1:00 a.m., or 2:00 a.m., and be awake from 3:30 a.m. or 4:00 a.m. and try to sleep until 6:00 a.m. or no later than 6:30 a.m.

The plaintiff described raising hunting dogs and caring for the puppies during the day and doing household chores. *Id.* Although he used to be much more involved in raising and training the dogs, he testified that he currently does not own any dogs himself - they belong to his sons - and that his physical involvement with feeding the dogs was limited to lifting the lid on the automatic feeders to ensure that they had food. If they did not have food, he might feed them a coffee can of food at a time. (Tr. 334-35.) This was the only physical activity involved in caring for the dogs.

The plaintiff testified that since the year 2000, he can no longer walk, "keep up," or do any household chores (Tr. 336), although he did a little cooking. His wife does not

work. His twenty-four and twenty-year-old sons were both in college and they helped their parents out financially. *Id.* The plaintiff used to enjoy fishing but has not fished since 1998 because he cannot cast a reel. (Tr. 337.) His social activities were limited to occasionally going out to eat with family, although he can drive a little, with stops. He drove two hours to the hearing and stopped twice to walk and stretch due to his back pain. *Id.* He experienced pain in his lower back with driving. (Tr. 338.)

The plaintiff stated that he had been diagnosed with depression and was going to counseling at Centerstone Mental Health Center. He first went in 2000 and reported being back a few times since then, most recently in the month before the hearing. He had another appointment at the end of February of 2004. He was prescribed an anti-depressant and "some other kind" of medication. (Tr. 339.) He testified that the medication seemed to be helping this time. He stated that he did feel depressed and "against the world," and trapped, helpless, frustrated and angry. *Id.*

The plaintiff reported that side effects of his medications included blurred vision, a "bad feeling" from his pain medication, and feeling "knocked out" by his muscle relaxer. (Tr. 340.) He felt dizzy and drowsy and would sometimes have to lie down and try to take a nap. The plaintiff could not do any kind of work that he was "use to." He did not know of any type of work he could be retrained to do. He testified that if he could work now, he would. (Tr. 341.)

The ALJ asked the VE to consider a hypothetical person who is 44 years of age, a high school graduate who can read, write, add and subtract, has a driver's license and can drive, and has some of the same past work as that performed by the plaintiff, with the same exertional and skill qualifications previously identified. The VE was to assume limitations of mild to moderate limitation in the ability to concentrate, and ability to occasionally lift thirty pounds and frequently lift twenty pounds, stand and walk for five hours of an eight hour day, with a need to change positions every two hours, but no limits on sitting, and climbing, balancing, stooping, crouching, kneeling, and crawling could all be performed occasionally. *Id.* The VE was also to assume a right upper extremity limitation of no routine reaching or pushing and pulling. (Tr. 341-42.) The VE concluded that under those conditions, none of the plaintiff's past work would be available. *Id.* However, the VE identified some unskilled, entry-level sedentary and light jobs that would be available, such as security guard (light), cashier (light), file clerk (light), messenger (light), telephone order clerk (sedentary), and information clerk (sedentary). (Tr. 342-43.) The VE estimated that there were about 6,020 such jobs in Tennessee. (Tr. 342.)

The plaintiff's attorney asked the VE to consider a person who, in addition to those limitations, was also limited to a combination of sitting, standing, lifting, and walking no more than two to three hours in an eight hour day. (Tr. 343.) The VE opined that there would be no full-time work available for a person with those limitations, not even on the

47

sedentary level. *Id.* The plaintiff's attorney next asked the VE about GAF scores. The VE offered that "a person with a global assessment of functioning of 50 or below would not be able to work on a sustained basis." (Tr. 344.) The plaintiff's attorney directed the VE to the plaintiff's GAF assessment of 50, and the VE repeated that at that level, a person would not be expected to perform full-time work, and that such an assessment "takes into account anything that might interfere with a person's psychological function," including physical and psychological difficulties. *Id.*

The plaintiff's attorney next asked the VE to return to the ALJ's hypothetical person and, in addition to limitations on the right upper extremity in reaching, pushing and pulling, asked the VE to assume additional restrictions in handling and feeling, and to assume that other activities of the right arm caused severe pain. (Tr. 345.) The VE opined that if the restrictions were mild to moderate, there would be no effect on the jobs mentioned. Serious restriction in the use of the right upper extremity would not affect the security guard, messenger, order clerk, and information clerk jobs, but could reduce the cashiering and filing clerk jobs by about half. *Id.* If the VE were to assume the same limitations in the left upper extremity as the right, there would be no significant limitations in addition to those already discussed, assuming that the hypothetical person could still lift thirty pounds occasionally and twenty pounds frequently. (Tr. 346.)

The VE described the security guard job as involving mostly sitting, with some walking around, some note-taking, and no lifting over a maximum of nine pounds. The average standing and walking requirement involved was fifteen to twenty minutes every one to two hours. *Id.* Assuming a person who had a restriction that he must elevate his foot about ninety degrees for fifteen to twenty minutes once an hour, the VE opined that the only available jobs would be the order clerk and information clerk jobs, and, in addition, the jobs of telemarketer or receptionist. (Tr. 347.)

Next, the plaintiff's attorney questioned the VE about chronic and severe pain. The VE explained that there are four levels of pain: mild, moderate, moderately severe, and severe. *Id.* With mild or moderate pain, none of the jobs would be significantly affected. (Tr. 348.) Moderately severe or severe pain would preclude work on a sustained basis. Inability to sleep at night would also be a factor taken into consideration according to its effect on work. A mild or moderate problem would not significantly affect work, while moderately severe or severe problem would affect a person's ability to understand, remember, concentrate, and persist in tasks. The VE testified that "substantial quantities and varieties of medication," including muscle relaxers, pain medication, and anti-depressants could affect an individual's ability to do the jobs described. *Id.* The VE testified that the same mild to severe scale would be applied, and added that side effects

49

and responses to medications differ from person to person, and that the inquiry should focus on the effect on that person and his ability to work. (Tr. 349.)

The plaintiff's attorney asked the VE to assume that the plaintiff's testimony regarding his difficulty sleeping and his pain was entirely truthful - that the plaintiff slept about two to three hours at a time and then was awake two to three hours, and that his medication relieved the pain somewhat, but that he still had substantial pain even after taking medication. (Tr. 350.) The VE responded that if, "his pain is persistently at the moderately severe, severe level, for whatever reason, whether it's from loss of sleep or any other reason, we would not expect him to work on a sustained basis." Similarly, if the plaintiff were unable to concentrate or persist or remember above the moderate level, whether from side effects of medications, severity of pain or loss of sleep, a person with those symptoms could not work on a sustained basis. However, a person experiencing mild to moderate symptoms would be able to work. *Id.*

At the conclusion of the hearing, the ALJ granted the plaintiff's request to submit additional medical records. (Tr. 351-52.) A notation on the hearing transcript noted that the record was reopened on March 23, 2004, to add a prescription dated February 23, 2004, and medical records dated February 19, 2004 from Dr. Sutter. (Tr. 296.) Those medical records are the results of the plaintiff's March 3, 2004, MRI. (Tr. 297-301.)

### 2. January 26, 2005, Hearing

A second hearing was held before ALJ William F. Taylor on January 26, 2005. (Tr. 354.)  The plaintiff was present and represented by counsel, and VE Doss again testified.  *Id.*

The plaintiff testified in response to the ALJ's questions that he was forty-five years old at the time of his hearing, had completed high school, was able to read, write, add and subtract, and had a driver's license and sometimes drove a car.  (Tr. 357-58.)  The plaintiff testified that he had smoked in the past but quit last year, drank occasionally, and had never had any problems with alcohol or drugs.  (Tr. 358.)  He was not currently working. *Id.*  His last full-time employment was in 1998.  (Tr. 359.)  He had engaged in part-time work as recently as a few weeks ago, working odd jobs on a farm.  He testified that he worked approximately three or four days a month to make money, and mostly fed chickens.  He received six dollars an hour for that work.

The plaintiff testified that he had an MRI about a month prior to the hearing at Murray Regional Hospital.  *Id.*  He acknowledged having an MRI in August 2001 and indicating at that time that he was working on a farm.  (Tr. 360.)  He has done this part-time work "off and on, for a while."  He had no other part-time work or income since February 2000.

51

Dr. Doss, VE, next testified, acknowledging that he had also been present and testified at the plaintiff's prior hearing. (Tr. 361.) The plaintiff's past work included work as a truck driver (medium and semiskilled), mechanic (medium and skilled), and a sawmill worker (medium and unskilled). *Id.* The VE testified that farm hand work, if vocationally relevant, could be classified from light to heavy, unskilled to semiskilled. (Tr. 362.)

The plaintiff's attorney next examined the plaintiff, eliciting testimony that the plaintiff works from two to three hours on the farm when he works, and that he could not work longer than that due to his pain. When he worked feeding the chickens, his job involved pushing buttons for the electronic feeder. *Id.* He had to stand up to do that job and could not sit down. (Tr. 363.) His foot bothered him while doing this work and he would have had a problem standing longer than two hours. *Id.* If he worked two to three hours one day, it would be hard to go back the next day, or work on a sustained basis. (Tr. 363-64.) The plaintiff testified that his shoulders, neck, and bulging disc would also limit his ability to work. (Tr. 364.)

The plaintiff testified that his right foot was crushed in a work accident in 1998, and that this problem still affects him today. *Id.* He has no feeling in his toes and his foot swells and turns blue and painful. (Tr. 365.) There is a feeling of pressure and inability to balance. He walks with a limp, and estimated that he could walk about five hundred feet before having to stop and rest or sit down. After walking five hundred feet, which would

52

take about an hour, he explained that he would probably experience swelling and discomfort and have to elevate the foot and apply ice or heat. (Tr. 365-66.) The plaintiff estimated that he could stand in one place for about thirty minutes. After this length of time, his foot would start aching, swelling and "really bothering" him. This would also require elevation for about an hour. *Id.*

These problems have persisted since his accident. (Tr. 367.) He is able to work feeding the chickens because he is able to sit down occasionally. The plaintiff testified that "hardly anything" could cause pain to flare in his foot. *Id.* He treated the pain with elevating the foot and taking four Lortabs a day. (Tr. 368.) He has taken them since 1998, and he also takes a muscle relaxer. *Id.* He sees his foot specialist, Dr. Adams, on a regular basis, every three months. *Id.* Dr. Adams has discussed sending him to a pain clinic, but the plaintiff has preferred to be treated by Dr. Adams. (Tr. 369.)

The plaintiff next testified about his shoulder surgeries. His first shoulder surgery occurred in 1999, shortly after he injured his foot. The plaintiff believed that the injuries were related, and that he injured or aggravated his shoulder when jerking a rack off of his foot during the accident that crushed his foot. *Id.* He reported having shoulder pain before the accident, but he believed that this worsened his condition. (Tr. 370.) The plaintiff testified that he had two surgeries on his right shoulder and one on his left shoulder, and he is right-handed. He has lost a lot of his grip in his right hand and has a lot of pain. It

53

hurts to raise his arm to shoulder level. *Id.* Although he is able to use his right hand to push buttons to feed the chickens, if he has to carry anything, he tries to use his left hand to avoid causing pain in his right hand and shoulder. (Tr. 371.) He was also more likely to drop things with his right hand. *Id.* The plaintiff testified that the surgery had not helped much. (Tr. 372.)

The plaintiff testified that his left shoulder surgery in 2003 helped for two or three months, but thereafter he continued to have the same pain in his left shoulder. (Tr. 372-73.) He reported that Dr. Adams had recently told the plaintiff that the bulging disc in his neck may be causing a lot of his pain and he wanted to perform surgery on it. An MRI taken the month before the hearing revealed the bulging disc, a pinched nerve, and defective disc spaces in the plaintiff's neck.

The plaintiff testified that he also had a degenerative disc in his lower back that caused him pain. *Id.* He explained that the pain went into his legs and that he had a back condition since before his accident (Tr. 374), but he had never had surgery on his back. He has been receiving treatment for arthritis since 2000, and he experienced pain and stiff joints as a result of the arthritis.

The plaintiff reported trying to use his left hand despite the fact that he is right-handed because his right hand and shoulder pain was "excruciating." (Tr. 375.) The plaintiff also testified that he has high blood pressure for which he is taking medication,

and that his doctors are "really concerned about" his high blood pressure affecting his organs. *Id.*

The plaintiff next testified about his problems with depression. (Tr. 376.) He believed his depression started when he could not find a job and support his family. He worried about paying the bills and getting along day to day. He testified that he has been getting treatment for about a year, including counseling and medication. *Id.* He reported that the treatment seemed like it was "helping some." (Tr. 377.) The plaintiff testified that he had trouble sleeping at night, trouble getting up, and difficulty getting out of the house. He stated that he worked all his life, and it was difficult to depend on his two sons for support. The plaintiff stated that he "s[at] around and cr[ied]," thinking about the things he was not able to do. He seldom socialized. *Id.* He previously hunted and fished, went out dancing, and worked on cars, none of which he could do anymore. *Id.*

The plaintiff described his difficulty sleeping. (Tr. 379.) He usually went to bed at ten o'clock at night and woke back up at three o'clock in the morning. Pain and thinking about "how [his problems] had changed [his] life" woke him up. He did not feel rested after sleep and had trouble concentrating and focusing. *Id.* The plaintiff had noticed some deterioration of his mental functions, and seldom read newspapers or books. (Tr. 380.) When he woke up in the middle of the night, he usually just sat in the dark thinking about his life, or got up and walked around and paced the floor. *Id.*

The plaintiff related that his typical day consisted of trying to sit and be comfortable, or "lay [and] watch a little TV," or stare out the windows. (Tr. 381.) He tried to help with the housework, including cooking and putting dishes in the dishwasher. He could no longer do yard work, although he used to enjoy mowing his yard. *Id.* He could not even use a riding lawnmower because "the bouncing around and the use of [his] arms" caused him pain. (Tr. 382.) On the days that he worked, he doubled up on his medicine.

The plaintiff testified that he did not feel able to sit for six hours at a workstation, lift or carry ten pounds occasionally and stand and walk for two hours. (Tr. 383.) He stated that his shoulders would cause him too much pain, even with medication. The pain was aggravated even by sitting and was bothering him during the hearing. *Id.* The plaintiff testified that the SSA had not sent him for any mental evaluations since the case had been remanded, or performed any additional consultative exams. (Tr. 384.)

The ALJ again questioned the VE, asking him to consider an individual between forty-one and forty-five years of age, with a high school education, who could read, write, add, subtract, and operate a motor vehicle. He was to assume past relevant work identical to the plaintiff's past work. He was also to assume a mild to moderate limitation in the ability to concentrate, ability to occasionally lift thirty pounds and twenty pounds frequently, and stand five hours in an eight hour day, no more than two hours at a time. (Tr. 384-85.) There were no limitations on sitting, but climbing, balancing, stooping,

crouching, kneeling, and crawling were all limited to occasionally. (Tr. 385.) No frequent

reaching, pushing or pulling was possible with the right, dominant, arm, but there were

no limitations on the left arm. There were no limitations with either arm or hand in terms

of handling and feeling, and no communication or environmental restrictions.

Under these limitations, the VE opined that none of the plaintiff's past work would

be available. However, there would be some light jobs and possibly a few sedentary jobs

that the hypothetical person could perform. Examples of jobs, all at the unskilled and light

levels, were working as a courier or a messenger, a general office clerk, counter clerk,

security guard, and mail clerk. (Tr. 385-86.) At the sedentary, unskilled level, work was

available as a sorter or inspector, and hand packer. (Tr. 386.) If such a person had a GAF

of 50, he would not be expected to be able to work on a sustained basis. *Id.* Finally, the VE

opined that taking all of the limitations as described by the plaintiff during the hearing, if

the ALJ found that his pain rose to the moderate severe to severe level, then "pain, by

definition . . . [would] interfere[] with concentration and regular work attendance, enough

to prevent work on a sustained basis." (Tr. 387.)


## III.  THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on July 25, 2005. (Tr. 19-28.) Based on the

record, the ALJ made the following findings. (Tr. 26-27.)

1.    The claimant met the disability insured status requirements of the Social Security Act on December 31, 2003. Since finding the claimant not disabled from date of application through February 22, 2004, and finding him disabled as of February 23, 2004, he no longer qualifies for disability and Disability Insurance Benefits.

2.    Although the claimant worked after the alleged onset date of disability, this work constituted a part-time employment that is not considered substantial gainful activity and the claimant has not engaged in substantial gainful activity since February 23, 2004, the date of disability.

3.    The medical evidence establishes that the claimant has the following "severe" impairments: reflex sympathetic dystrophy syndrome of right lower extremity and foot, status post right and left shoulder arthroscopy with residuals, lumbar disc herniation, and cervical degenerative disc disease.

4.    The claimant has no impairment that meets or equals the criteria of any impairments listed in Appendix 1, Subpart P, Regulations [sic] No. 4.

5.    The claimant's assertions concerning his ability to work are credible for the period beginning February 23, 2004.

6.    Prior to February 23, 2004, the claimant retained the residual functional capacity to perform a limited range of light work activity as described in the body of this decision.

7.    The claimant is unable to perform the requirements of his past relevant work.

8.    The claimant's residual functional capacity for the full range of sedentary work is reduced by additional limitations as of February 23, 2004.

9.    On February 23, 2004, the claimant was a younger individual age 45-49. The claimant has a high school diploma.

10.   Prior to February 23, 2004, based on an exertional capacity for light work, and the claimant's age, education, and work experience, there were a significant number of jobs in the national economy that he could perform. Examples of such jobs are cited above. Medical-Vocational Rule 202.20 is used as a framework for decision-making and vocational expert testimony.

58

11.    Prior to February 23, 2004, the claimant was not under a disability, as defined in the Social Security Act.  20 CFR 404.1520(g) and 416.920(g)

12.    Beginning February 23, 2004, considering the claimant's additional limitations, he cannot make an adjustment to any work that exists in significant numbers in the national economy; a finding of disabled is therefore reached within the framework of medical-vocational rule 96.8p.

13.    The claimant has been under a disability as defined in the Social Security Act, since February 23, 2004.  20 CFR §§ 416.920(g)

The ALJ's decision became the final decision of the Secretary when the Appeals Council denied the plaintiff's request for review on March 28, 2006.  (Tr. 7-9.)

## IV.  DISCUSSION

### A.  Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion.  42 U.S.C.A. § 405(g).  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases).  The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion.  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).

59

Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C.A. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is performing

60

substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C.§ 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish

61

that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner of carrying his

burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her,* 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the plaintiff can perform, he is not disabled.[19] *Id. See also Tyra v. Sec'y of Health & Human Servs.,* 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.,* 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler,* 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step five of the five-step inquiry, and did ultimately conclude that the plaintiff was under a disability as defined by the Act. (Tr. 26-27.) At step one, the ALJ found that the plaintiff had not engaged in substantial

---

[19]This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if he applied. *Ragan v. Finch,* 435 F.2d 239, 241 (6th Cir. 1970).

gainful activity since the year 2000, even though he had worked part time.[20]  (Tr. 21.)  At

step two, the ALJ found that the plaintiff had severe impairments consisting of RSD of the

right lower extremity and foot, post right and left shoulder arthroscopy with residuals,

lumbar disc herniation, depression,[21] and cervical degenerative disc disease.  (Tr. 26-27.)

At step three, the ALJ determined that the plaintiff's impairments did not meet or

medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

(Tr. 27.)  At step four, the ALJ found that the plaintiff was unable to perform his past work.

At step five, the ALJ concluded that although prior to February 23, 2004, the plaintiff could

perform light work and the medical-vocational grid would indicate that the plaintiff was

not under a disability, after February 23, 2004, he could not make an adjustment to any

work that exists in significant numbers in the national economy, and a finding of disabled

is directed by the medical-vocational framework.  *Id.*

---

[20]In addition to the plaintiff's testimony that he worked part time doing light farm chores, there are a few other instances in the record that indicate that the plaintiff was working at least part time during this period.  *See, e.g.*, Tr. 272-74 (treatment notes from Dr. Adams dated September 2000 and March 2001, indicating that the plaintiff was working part time or full duty).

[21]The ALJ lists depression as a severe impairment in the body of his decision (Tr. 21), but the ALJ does not address this impairment in his findings at the end of the decision. (Tr. 26-27.)

The effect of this decision was to preclude the plaintiff from receiving any DIB at all, having missed the cut off for date last insured by two months, and to award SSI benefits, if eligible, but only beginning after February 23, 2004. (Tr. 28.)

### C. Plaintiff's Assertions of Error

The plaintiff alleges that the ALJ erred in several respects. He asserts that the ALJ did not give proper weight to the evidence presented by the plaintiff's treating physicians, that the ALJ did not apply the correct legal standards in making his decision, that the ALJ erred in not finding the plaintiff's testimony credible and "most importantly" erred in assigning the date of his disability. Docket Entry No. 15, at 1-2.

The Court agrees that the most important issue presented on review in this case is the ALJ's decision with respect to the plaintiff's onset date, and additionally agrees that remand for the award of benefits is appropriate.

**The ALJ erred in determining that the plaintiff was not disabled until February 23, 2004, and in assigning this date as his date of onset.**

The medical records provided in this case are extensive, and they have been thoroughly summarized in the preceding sections of this Report and Recommendation. The plaintiff has undergone extensive, regular, and sometimes very serious medical treatment by both his regular family physician, treating specialists, and surgical specialists

65

over the past ten years, essentially beginning with his severe foot injury in 1998.  Beginning in 1998, the plaintiff was unable to obtain or retain full-time work.  In addition to foot problems, the plaintiff experienced severe problems with both upper extremities, requiring three surgeries, and he eventually developed a problem with depression stemming from and exacerbated by his worsening physical problems and his continuing inability to work.

The ALJ undertook a review of the plaintiff's medical history, summarizing the medical evidence of record, and discussing the various sources and the level of deference he accorded to each.  (Tr. 25.)  Specifically, the ALJ identified Dr. Adams as a "specialist and orthopedic surgeon," and assigned his opinion controlling weight.  The ALJ was referencing Dr. Adams' 2003 opinion that assessed what the ALJ characterized as "limited range of light work."  (Tr. 268-70, 25.)  The ALJ also assigned "significant weight" to non-examining physician Dr. Tilley and to the non-examining sources Frank Kupstas, Pd.D., and Larry Welch, Ed.D., and he awarded "considerable weight" to Dr. Doineau. (Tr. 25.)  The ALJ accorded little or no weight to other treating, examining, and consultative sources.  *Id.*

Immediately following this discussion, the ALJ concluded that "prior to February 23, 2004, the claimant retained the residual functional capacity to perform a limited range of light work activity with occasional postural activities . . . limited reaching, and pushing/pulling. " *Id.*  It is initially unclear how the ALJ arrived at the February 23, 2004,

66

date until later in his opinion, when the ALJ stated that, "beginning February 23, 2004, the claimant's treatment records indicated significant changes in his lumbar spine, shoulders, and cervical spine. On February 23, 2004, outlined limitations of function that would preclude an individual from being able to perform even sedentary work over the course of a normal 8-hour workday or a 40-hour workweek." (Tr. 26.) The ALJ cited to Exhibits B-18F, B-19F, and B-20F in support of this statement. *See* Tr. 296, 289-301, 303-11. The ALJ explained, "[n]ew medical evidence from the treating source is given more weight. This opinion is well support [sic] by the opinion of the treating source; the medical signs and finding [sic]; the claimant's daily activities which are substantially restricted." *Id.*

The ALJ's statements above are simply erroneous. The plaintiff did not experience any "significant changes," he was not assigned any new "limitations of function," and there was no "new medical evidence from the treating source" on this date. In fact, the only medical evidence in the entire record dated February 23, 2004, is the prescription pad summary by Dr. Adams of the plaintiff's pre-existing and chronic conditions of chronic, severe right arm pain, history of right shoulder surgery, cubital tunnel syndrome, left shoulder surgery, and chronic pain and arthritis in his foot due to his 1998 injury and an accompanying treatment note from an office visit that same day. (Tr. 296, 305.) This is identified as Exhibit B-18F. *See* Tr. 296.

The other exhibits cited by the ALJ include B-19F, a radiologist's report of the plaintiff's February 19, 2004, spine lumbar MRI. (Tr. 298-301.) This MRI revealed simply "mild disc bulge and facet degenerative change." (Tr. 298.) This was hardly anything new. In fact, an MRI from March 8, 2000, revealed that the L5-S1 disc was degenerated with left lateral disc herniation that appeared to impinge on the left S1 nerve root. (Tr. 197.) The 2000 MRI arguably revealed a more severe condition than the 2004 MRI, which did not indicate any nerve involvement. Therefore, the ALJ could have hardly relied upon this exhibit in support of his determination of February 23, 2004, as the date of onset or his allusions to "significant changes" or "new medical evidence."

The final remaining citation is to exhibit B-20F, a collection of Dr. Adams' treatment notes dating from January 12, 2004, through September 17, 2004, and a record of a cervical MRI taken September 3, 2004, that showed mild spondylitic changes and enlarged tonsils. (Tr. 302-11.) The only evidence in this exhibit potentially relevant to pinning down the February 23, 2004, date are Dr. Adams' treatment notes from that day. (Tr. 305.) The only remarkable aspect of Dr. Adams' notes from that day is his addendum at the end, "I think at this point I have wrote [sic] him a note out that I think he is a candidate for disability because he has both involvement in his upper and lower extremities and it is going to make it very difficult for him to return to gainful employment based on the combination of problems he has." *Id.*

68

It is clear that the ALJ picked February 23, 2004, based on the treatment notes and summary of impairments of Dr. Adams completed on that day. (Tr. 296, 305.) The plaintiff is correct to challenge the ALJ's methodology. The ALJ's choice of February 23, 2004, as the date of onset is neither the correct date of onset, nor even a "date of diagnosis," as the plaintiff avers. *See* Docket Entry No. 15, at 2. All of the plaintiff's problems described by Dr. Adams and relied upon by the ALJ originated, were formally diagnosed, and became limiting far sooner than February 2004, as abundantly demonstrated by the medical evidence of record. The Court finds that based on a thorough review of the record, the ALJ's assignment of date of onset is arbitrary and not based on substantial evidence.

The ALJ's finding of a plaintiff's onset date must be supported by substantial evidence. *Blankenship v. Bowen*, 874 F.2d 1116, 1121-1122 (6th Cir. 1989). Even under the very deferential standard of review that must be employed in these cases, it cannot be said that the ALJ relied upon substantial evidence in fixing the plaintiff's date of onset at February 23, 2004. He relied, instead, upon a short list of pre-existing, chronic impairments that had plagued the plaintiff and gradually worsened over a period of many years. The defendant attempts to explain the ALJ's reliance upon this date by pointing out that Dr. Adams somehow "altered his assessment" on February 23, 2004, when he expressed his belief that the plaintiff was a candidate for disability. Docket Entry No. 18, at 12. This argument fails in light of Dr. Adams' December 6, 1999, note indicating that he had written

69

letters on the plaintiff's behalf in an attempt to help him get his disability benefits. (Tr. 275.) The February 23, 2004, note was nothing new and represented no change of heart for Dr. Adams, apparently an advocate for the plaintiff receiving disability benefits as early as 1999, and no change in circumstances for the plaintiff.

This determination alone represents sufficient cause to remand the plaintiff's case for further proceedings to determine the correct date of onset. However, the Court is extremely reluctant to further prolong this process in light of the specific circumstances in this case. The plaintiff's claim has been outstanding since 2001. The Appeals Council has already remanded this case to the same ALJ with extensive and specific instructions. The ALJ, upon being given very specific directives, issued his determination assigning a wholly unsupported date of onset.

Remand for an award of benefits is appropriate "if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). *See also Woods v. Sec'y of Health & Human Servs.*, 808 F.2d 506 (6th Cir. 1987) (ordering an award of benefits where the medical proof of disability was strong and consistent). Stated another way, "if a court determines that substantial evidence does not support the Secretary's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement

70

to benefits." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 173 (6th Cir. 1994). The Court has such a case before it.

The ALJ's determination of onset date is not supported by substantial evidence. There is no doubt as to the plaintiff's disability. The ALJ acknowledged the existence of the plaintiff's disability for reasons that pre-date the ALJ's date of onset, and the medical record is clear and thorough. In addition, this case has already been remanded for a supplemental administrative hearing. *See Coldwell v. Gardner*, 386 F.2d 56, 74 (6th Cir. 1967) (holding that an award of benefits rather than remand was appropriate where the claim had previously been remanded for a second administrative hearing).

The only question remaining before the Court is the assignment of an appropriate date of onset. Although the nature of the plaintiff's impairments is chronic and his overall condition has been in a gradual state of decline, the Court believes that September 21, 2001, the date of the current application for disability, represents a fair approximation of the date on which the plaintiff's combination of impairments became disabling such that he could no longer perform any work.

On August 29, 2001, a left shoulder MRI presented objective proof that the plaintiff was suffering from a serious impairment in not just his right shoulder, on which he had previously undergone surgery, but also his left, representing involvement of both of his upper extremities. (Tr. 157-58, 191.) Shortly thereafter, on September 14, 2001,

71

Dr. Lawrence recommended and scheduled left shoulder surgery. (Tr. 239.) The plaintiff's treating family physician, Dr. Anand, noted  hypertension, rotator cuff injury, disc bulge at L5, and an anxiety disorder on September 12, 2001.  (Tr. 177.)  The plaintiff filed for disability on September 21, 2001.  Just over a month later, on November 6, 2001, a DDS examiner assigned an RFC for less than sedentary work.  (Tr. 200.)  The records of the plaintiff's chief treating specialist, Dr. Adams, also support a date of onset around this time. The plaintiff saw Dr. Adams on July 2, 2001, and October 29, 2001, reporting ongoing foot pain and complications from his RSD.  (Tr. 271.)  Although Dr. Adams was scrupulous about documenting the plaintiff's work status on previous visits, the last date that his records indicated an attempt to work was March 19, 2001.  (Tr. 272.)  By November 28, 2001, Dr. Doineau diagnosed a depressive disorder with symptoms of anxiety in addition to the plaintiff's crushed foot, back problems, history of shoulder surgery and pain and other medical complaints.  (Tr. 207.)  The plaintiff has consistently testified about his limitations and resulting effect on his ability to work, support his family, and engage in all but the most limited of daily activities.

For the foregoing reasons, the Court believes that the evidence of record supports an onset date of September 21, 2001.  This case should be remanded with instructions to direct a finding of disability as of this date, and for an award of benefits from September 21, 2001, until the expiration of the plaintiff's insured status on December 31, 2003.

72

## III.  RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 14) be GRANTED, the plaintiff's alternative motion for remand to determine the correct onset date be DENIED as moot, and the case REMANDED for an immediate award of DIB benefits in accord with a September 21, 2001, onset date.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this notice, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge

73